676 F.2d 1043
 29 Fair Empl.Prac.Cas. 433,
29 Empl. Prac. Dec. P 32,717
Oliver W. SCARLETT, H. B. Starkes, Franklin D. R. Bell,
David Jones, W. J. Odol, L. A. Waters, W. K.
Lindsey, J. Wimyond Jones, Horace V. Thomas and
William D. Rood, Plaintiffs-Appellees, Franklin D. R. Bell,
W. J. Odol, W. K. Lindsey, Plaintiffs-Appellees,
Cross-Appellants,
v.
SEABOARD COAST LINE RAILROAD CO., Defendant-Appellee, Cross-Appellee.
v.
UNITED TRANSPORTATION UNION, Defendant-Appellant, Cross-Appellee.
 No. 79-3922.
 United States Court of Appeals,
Fifth Circuit.
 Unit B*
May 24, 1982.
 
 Rives, Peterson, Pettus, Conway, Elliott & Small, Clarence M. Small, Jr., Thomas A. Carraway, Birmingham, Ala., for United Transp. Union.
 Fletcher Farrington, Savannah, Ga., O. Peter Sherwood, Jack Greenberg, New York City, for Scarlett, et al.
 Malcolm R. Maclean, F. Saunders Aldridge, III, Savannah, Ga., for Seaboard Coast Line R. Co.
 Before HILL, HENDERSON and ANDERSON, Circuit Judges.
 JAMES C. HILL, Circuit Judge:
 
 
 1
 These plaintiffs[1] believe that they have been deprived of employment opportunities and benefits because they are black. Invoking the provisions of 42 U.S.C. §§ 1981 and 2000e et seq., they have sued both their employer, the Seaboard Coast Line Railroad Company (SCL)[2] and the labor union which represents them, the United Transportation Union (UTU).[3] The gravamen of their complaint is that SCL and UTU collectively bargained, inter alia, a seniority system which has perpetuated the allegedly illegal racial discrimination and has resulted in present violations of the federal laws. They have asked for both declaratory and injunctive relief as well as back pay.[4]
 
 
 2
 The case was tried without a jury. Six of the plaintiffs testified.[5] Additionally, plaintiffs read from two scholarly treatises,[6] offered into evidence under Federal Rule of Evidence 1004, which discussed and analyzed racial issues germane to employment on the railroad generally. Essentially, plaintiffs' evidence established that prior to the Civil Rights Act of 1964 blacks were excluded from certain jobs on the railroad and thus were unable to accumulate the seniority and other benefits available to their white contemporaries who worked in those particular positions. The evidence also demonstrated that because blacks were excluded in the past some are unable to compete with their white contemporaries for those positions today. Thus, plaintiffs insist, the advantages of the seniority system flow disproportionately toward whites and away from blacks.
 
 
 3
 The defendants did not rebut plaintiffs' evidence establishing that blacks were once excluded from certain crafts. Rather, defendants attempted to demonstrate that no present violation of the federal laws has occurred. They showed that the seniority system is neutral both facially and as applied and insisted that a legitimate seniority system which does no more than continue the effects of pre-Civil Rights Act discrimination is not illegal.
 
 
 4
 Trial lasted two days. The district court, after considering all of the evidence, whether offered before trial or at trial, found the defendants liable. The seniority system, the court concluded, is facially neutral, but "the defendants perverted it by applying it to Blacks discriminatorily." Record, vol. VII, at 201. Furthermore, the court concluded that the seniority "system has not been negotiated and maintained free from any illegal purpose." Id. This, the court held, constituted a violation of Title VII. Nevertheless, the court granted relief to only some of the plaintiffs, because the others had not convinced the court that they had suffered from any discrimination.[7]
 
 
 5
 Not all of the issues presented to the district court have been resolved;[8] this, therefore, is an interlocutory appeal. Defendant UTU has appealed from the district court's finding that the defendants violated the federal anti-discrimination laws. Three of the trainmen plaintiffs who were dismissed have filed cross-appeals, alleging they should not have been dismissed. We have divided the issues before us into four categories: (1) administrative prerequisites to pursuit of Title VII claims; (2) statutes of limitations applicable to the plaintiffs' section 1981 claims; (3) issues focusing on the railroad's seniority system; and (4) issues raised in the cross-appeal. For the reasons discussed below, we affirm in part, reverse in part, and remand for further proceedings.
 
 
 6
 I. Administrative Prerequisites to Title VII Claims
 
 
 7
 Above all else, the record before us reveals a convoluted and untidy presentation of these plaintiffs' claims. We have a copy of one "Charge of Discrimination," filed on October 13, 1972 by Scarlett, naming the Seaboard Coast Line Railroad and complaining that "the company and union seniority system perpetuates past discrimination against blacks in the present." In an accompanying narrative, Scarlett described the event which prompted him to file the charge.[9] Plaintiff's Exhibit 1. The charge is marked "Case File No. TMM3-0356. It is not clear what developed from this charge. There is some suggestion that Scarlett received a response from the Equal Employment Opportunity Commission (EEOC); there is also some suggestion that the EEOC misplaced the charge. Record, vol. I, at 16, Exhibits A & B. There is nothing suggesting Scarlett sued.
 
 
 8
 In any event, it appears that Scarlett filed a second charge on February 27, 1976. We do not have a copy of the charge; we are told generally that it "charg(ed) defendants with discrimination based on race." Record, vol. I, at 1:4. Shortly thereafter, the EEOC sent Scarlett a Notice of Right to Sue. That notice is dated March 2, 1976; it is numbered TMM3-0356 (could this be a belated response to Scarlett's 1972 charge?); it states that Scarlett's charge (which one?) "has been dismissed for ... failure to proceed"; it explains to Scarlett that he has "the right to sue the respondent(s) named in this case"; and it indicates that copies were sent to both SCL and UTU. Record, vol. I, at 16, Exhibit C. Scarlett claims that he received the notice on March 19, 1976. His complaint was filed June 15, 1976, eighty-eight days later.
 
 
 9
 Joining Scarlett in the complaint, however, are ten other plaintiffs.[10] We are told that six of these plaintiffs filed charges with the EEOC on the same day Scarlett filed his second charge; another plaintiff filed a charge on May 10, 1976; two more filed charges on October 11, 1976. We do not have any of these charges. Even if one accepts that these charges exist, it is clear that three of them were filed after the plaintiffs had brought suit.
 
 
 10
 The complaint clearly establishes, however, that only Scarlett had been notified by the EEOC of his right to sue prior to the filing of the complaint. It is beyond argument that a prerequisite to a cause of action under Title VII is the exhaustion of administrative remedies, usually evidenced by the filing of a charge with the EEOC and the receipt of notice of the right to sue. 42 U.S.C. § 2000e-5(e) and (f). With this in mind, the district court dismissed the Title VII claims of all plaintiffs except Scarlett because they had not alleged individual compliance with the administrative prerequisites of Title VII. The court invited the plaintiffs to amend their complaint. Record, vol. I, at 33:7.
 
 
 11
 Meanwhile, however, plaintiffs moved to amend their complaint to include class allegations, suggesting in an accompanying memorandum that "the jurisdictional prerequisites becomes (sic) immaterial once plaintiffs' complaint is amended to make it a class action. It has long been settled law in the Fifth Circuit that the jurisdictional prerequisites of Title VII are met if one class member has complied with them. Oatis v. Crown Zellerbach Corp., 398 F.2d 496 (5th Cir. 1968)." Record, vol. I, at 17:2. The motion to amend was granted, but apparently plaintiffs never followed through with a motion for class certification. For that reason, and also because SCL established that any potential class lacked the requisite numerosity, the district court denied class certification. Record, vol. II, at 73. Finally, or so it appeared, the district court held that even Scarlett had failed to satisfy the administrative prerequisites to maintenance of his Title VII claims. Consequently those claims were dismissed for failure to file a timely charge with the EEOC. Record, vol. II, at 76; vol. III, at 82. Eventually, on October 27, 1977, the entire complaint was dismissed with prejudice. Record, vol. III, at 102.
 
 
 12
 That judgment was later opened, primarily for substantive reasons,[11] on plaintiffs' Fed.R.Civ.P. 59(e) motion. Record, vol. III, at 110; vol. IV, at 127. The court also reconsidered its previous findings and concluded that Scarlett had filed a timely charge, since his allegations fell " 'within the accepted doctrine of continuing violations.' " Record, vol. IV, at 127:3 (quoting Clark v. Olinkraft, Inc., 556 F.2d 1219, 1221 (5th Cir. 1977)). The other plaintiffs, however, were not allowed to reassert their Title VII claims; the court concluded both that they had failed to allege that they had exhausted their administrative remedies and that they could not depend upon Scarlett's exhaustion of his administrative remedies. Record, vol. IV, at 127:3-4.
 
 
 13
 Two and a half months later, plaintiffs moved to amend their complaint to allege satisfaction of the administrative prerequisites. Apparently, after receiving the court's order dismissing the Title VII claims, plaintiffs (except Scarlett) "began what turned out to be a Herculean effort to obtain the necessary letters from an inexplicably balky EEOC." Plaintiffs' Memorandum in Support of Their Motions to Amend the Order of June 13, 1978, and for Leave to Amend and Supplement the Complaint, Record, vol. V, at 140:3. It seems that the EEOC had declined to issue the requisite notices because plaintiffs had already filed suit.[12] Eventually, the remaining plaintiffs received right to sue notices.[13]
 
 
 14
 Thus, the district court confronted a somewhat outlandish Title VII scenario: the lawsuit was filed after most of the named plaintiffs filed administrative charges but before any plaintiffs, except one, received notice that the administrative procedures had been concluded. The remaining plaintiffs, apparently assuming that they would be certified as a class and thus could depend upon the exhaustion allegations of one class member, declined to complete the administrative process. When this assumption proved faulty, the remaining plaintiffs completed the administrative process and asked the court for permission to amend the original complaint to allege that they had satisfied the administrative prerequisites, albeit after the complaint had been filed. The district court decided to allow the remaining plaintiffs to assert Title VII claims without alleging that they individually had exhausted their administrative remedies.
 
 
 15
 Basically, then, there are two issues regarding the ability of the plaintiffs to pursue their Title VII claims in the district court.[14] (1) did Scarlett satisfy the administrative prerequisites to maintenance of his Title VII claim, and (2) if so, should the remaining plaintiffs be allowed to ride along?Section 2000e-5(e) of Title 42 provides: "A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred...." Courts, perhaps somewhat loosely, have referred to this 180-day requirement as a jurisdictional prerequisite. This court, however, has indicated that this requirement is in the nature of a statute of limitations and is not a prerequisite to subject matter jurisdiction. Coke v. General Adjustment Bureau, Inc., 640 F.2d 584 (5th Cir. 1981) (en banc).[15] That view was recently affirmed by the Supreme Court in Zipes v. Trans World Airlines, Inc., --- U.S. ----, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). In Zipes the court expressly held that the 180-day filing period for Title VII claims is not jurisdictional but serves instead the function of a statute of limitations. --- U.S. at ----, 102 S.Ct. at 1132.
 
 
 16
 Defendants argue that Scarlett did not file his charge with the EEOC within 180 days of any allegedly discriminatory act. The argument is not without merit. We do not have a copy of Scarlett's 1976 charge, so it is impossible for us to determine what he alleges is the unlawful act which prompted it. We do have Scarlett's 1972 charge, so we know what act prompted it; however, there is some suggestion that this lawsuit is not a product of that charge.[16]
 
 
 17
 The district court, however, found a way around the limitations problem. It concluded that Scarlett has not alleged that he suffered from a particular discriminatory act. Rather, Scarlett has alleged that the seniority system perpetuates illegal discrimination, and thus that the defendants continually violate Title VII. Inevitably then, Scarlett argues, illegal discrimination has occurred within 180 days of the filing of the charge.
 
 
 18
 As this court has noted, "(c)ase law on the subject of continuing violations has been aptly described as 'inconsistent and confusing,' both prior to and since the Supreme Court's decision in United Air Lines, Inc. v. Evans, 431 U.S. 553 (97 S.Ct. 1885, 52 L.Ed.2d 571) (1977)." Dumas v. Town of Mount Vernon, 612 F.2d 974 (5th Cir. 1980)[17] Evans, undoubtedly, dealt a severe blow to the theory of continuing violations. Evans had been wrongfully terminated in 1968; she was rehired as a new employee in 1972. The issue before the Supreme Court was whether United Air Lines committed a second violation of Title VII by refusing to credit her with seniority for any period prior to 1972. The Court agreed with Evans that the company's seniority system gave present effect to a past act of discrimination. The Court concluded, however, that mere continuity of impact was not enough; Evans had to allege that a present violation supported her charge. Because she did not, her claim was dismissed. The Court explicitly stated: "(A) challenge to a neutral system may not be predicated on the mere fact that a past event which has no present legal significance has affected the calculation of seniority credit, even if the past event might at one time have justified a valid claim against the employer." United Air Lines, Inc. v. Evans, 431 U.S. at 560, 97 S.Ct. at 1890.
 
 
 19
 Notwithstanding Evans, this court has endorsed the theory of continuing violations. Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977). We are persuaded, however, that Scarlett has not alleged a continuing violation that will pass muster under the Evans decision. The factual basis for any continuing violation in this case cannot be made consistent with the plaintiffs' theory regarding the non bona fides of the defendants' seniority system without running afoul of Evans.
 
 
 20
 Specifically, plaintiffs contend that the taint in the seniority system, rendering it non bona fide under section 703(h) and thereby affording no immunity from liability,[18] is the past[19] perversion of that facially neutral system so as discriminatorily to deny black trainmen the right to be called for promotion to conductor.[20] The continuing violation theory presupposes that if the seniority system itself is discriminatory, that system's daily operation results in some actionable conduct within the 180-day limitations period. But if the system is discriminatory because it was selectively applied to promote whites and not blacks, the only consequence of past failures to call blacks for promotion is a current adverse impact on seniority-related benefits. This effect-that is, the continuing impact of past promotion discrimination-is not enough under Evans to support a continuing violation theory. Scarlett's Title VII claim is therefore barred by his failure to file a charge within 180 days of an alleged discriminatory act or to present a challenge to the seniority system which constitutes a continuing violation.
 
 
 21
 The fate of the remaining, nonfiling plaintiffs in this nonclass action is linked to that of Scarlett. In Crawford v. United States Steel Corp., 660 F.2d 663 (5th Cir. 1981), this court allowed plaintiffs in a nonclass action who had not individually exhausted their administrative remedies to proceed on the basis of another plaintiff's timely filed EEOC charge. Because Scarlett has not satisfied these prerequisites, the Title VII claims of the remaining plaintiffs are likewise barred.
 
 
 22
 Although relief under Title VII is not available, the plaintiffs also brought suit under 42 U.S.C. § 1981. We turn now to examine whether the district court's finding of liability may be affirmed under this statute.
 
 
 23
 II. Statutes of Limitations for Section 1981 Employment
 
 Discrimination Claims
 
 24
 The use of section 1981 as an avenue for redress of employment discrimination is not constrained by the administrative prerequisites held above to bar the Title VII claims in this case. The defendants contend, however, that relief under section 1981 is barred by the statute of limitations.
 
 
 25
 Because section 1981 contains no express limitation period, the controlling period is the most appropriate limitation provided in the state in which the action was filed. See Johnson v. Railway Express Agency, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). Defendants object to the trial court's application of the twenty year statute of limitations under Georgia Code § 3-704 to the plaintiffs' claims for equitable relief under section 1981. The court also dismissed the plaintiffs' claims for back pay as barred by the two-year limitation placed on recovery of wages by section 3-704.[21] Defendants contend that this bifurcated application of section 3-704 is erroneous and that one limitation period-i.e., two years-should apply to the entire cause of action under section 1981. The defendants' argument is foreclosed by a recent decision of this court. In Whatley v. Department of Education, 673 F.2d 873, 877 (5th Cir. 1982), we concluded that for purposes of § 1981 claims " § 3-704 as written must be applied in a bifurcated manner so that an action for equitable relief is barred only after twenty years, but an action for back pay is barred after only two years."
 
 
 26
 That a discriminatee litigating his section 1981 claim for equitable relief in Georgia may file suit any time within twenty years while a discriminatee in another state may have to act with more speed does not give us pause to reconsider our holding, as defendants urge. By failing to supply its own limitation for section 1981 claims, Congress has intended the application of whatever limitation the forum state provides for state actions most closely resembling these claims-be it one year or twenty. See Johnson v. Railway Express Agency, supra. Hence, the Georgia discriminatee is simply the beneficiary of the Georgia legislature's largesse and Congress' knowing inaction.
 
 III. The Seniority System
 
 27
 Having determined that the applicable statute of limitations does not bar the plaintiffs' section 1981 claim, we address the issue of liability under the statute. The district court concluded that some of the plaintiffs had established a prima facie case of promotion discrimination and were therefore entitled to seniority relief under section 1981.[22] In reaching that conclusion the court rejected the contention that the difference in treatment could be justified as the product of application of a bona fide seniority system.[23] The district court determined that, because SCL's seniority system was maintained and continued in part for the purpose of discriminating against blacks, the system was not bona fide and therefore not immune under § 703(h) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(h).
 
 
 28
 The defendants attack the district court's conclusion on two grounds: (1) the promotional practice or rule at issue is not a part of the railroad's seniority system, and (2) even if it were, that system is bona fide within the meaning of section 703(h). We need not address these arguments because we find on other grounds that the protection of section 703(h) is not available to these defendants.
 
 
 29
 At the focal point of plaintiffs' attack on the seniority system is a collective bargaining agreement provision regarding promotion from trainman to conductor. As it appeared in the 1951 bargaining agreement between UTU and the Atlantic Coast Line Railroad, a predecessor to SCL,[24] that clause provided: "Trainmen will be in line of promotion dependent upon their qualifications and seniority. The senior trainman will be given preference if he desires it." Plaintiffs' Exhibit 35. A substantially similar clause appeared in the 1968 agreement between SCL and UTU: "Promotion will be from trainmen to freight conductor in the relative standing on the trainmen's seniority roster. Trainmen having at least two years' experience as such shall be in line for promotion." Plaintiffs' Exhibit 36. Conceding that this promotional policy is facially neutral, plaintiffs argued at trial, and the district court agreed, that SCL and UTU have applied it consistently to discriminate against black trainmen. Plaintiffs Scarlett, Starkes, J. Jones, Thomas, and Rood established trainmen seniority in the late 1930's and early 1940's. Nevertheless none was promoted to conductor until at least 1967. White trainmen, junior to these plaintiffs in trainman seniority, were called for promotion during that time, however.
 
 
 30
 According to the plain language of the statute, section 703(h) operates to immunize an employment practice which would otherwise constitute unlawful discrimination when the difference in treatment complained of is effected "pursuant to" a bona fide seniority system. In this case the differing treatment of black trainmen was not the product of applying the facially neutral provision regarding promotion. Rather, the discrimination was the result of the defendants' consistent disregard of the applicability of that provision to black trainmen. Hence it cannot be said that the different treatment accorded the plaintiffs was "pursuant to" the seniority system, for quite the opposite occurred. The rights granted to the plaintiffs by the promotion provision were simply ignored. We therefore conclude that section 703(h) offers no immunity to the defendants and affirm the trial court's judgment that those plaintiffs who established a prima facie case were entitled to seniority relief under section 1981.
 
 IV. The Cross-Appeal
 
 31
 Three of the trainmen plaintiffs whose claims were dismissed by the district court-Bell, Odol, and Lindsey-have cross-appealed, questioning the propriety of their dismissal. The defendants contend that these plaintiffs should not be heard because this court lacks jurisdiction over the cross-appeal. Whether or not the precise order from which these plaintiffs filed a notice of cross-appeal[25] is independently reviewable, a court of appeals may, in the interest of orderly judicial administration, review matters beyond that which supplies appellate jurisdiction. Mercury Motor Express, Inc. v. Brinke, 475 F.2d 1086, 1091 (5th Cir. 1973); see Myers v. Gilman Paper Co., 544 F.2d 837, 847 (5th Cir. 1977). Indeed, the Supreme Court has approved the power of an appellate court to reach other issues in a case properly before it on interlocutory appeal. See Deckert v. Independence Shares Corp., 311 U.S. 282, 287, 61 S.Ct. 229, 232, 85 L.Ed. 189 (1940). We proceed, therefore, to consider the propriety of dismissal.
 
 
 32
 The district court dismissed the employment discrimination claims of cross-appellants Bell, Odol, and Lindsey on the ground that each had failed to demonstrate that he applied for a job as trainman or was discouraged from applying by his knowledge of the defendants' discriminatory hiring policy. The court cited McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as support for its ruling that these plaintiffs had failed to meet their burden of proving a prima facie case. The cross-appellants do not argue that they did establish a prima facie case; rather, they maintain that the court applied the wrong legal standard regarding the respective burdens of proof and that their dismissal was premature. We disagree.
 
 
 33
 The district court appropriately relied on the burden of proof set forth in McDonnell Douglas for an individual, proceeding as an individual, who claims he is the victim of a racially discriminatory hiring decision.[26] Notwithstanding our conclusion that the Title VII claims of all the plaintiffs are time-barred, the McDonnell Douglas standard was correctly invoked. Although McDonnell Douglas addresses the elements of a prima facie case under Title VII, this court has held that, given the similarity of a Title VII disparate treatment claim and a section 1981 claim,[27] the evidence establishing a prima facie case under the former statute suffices to establish a prima facie case under the latter. Baldwin v. Birmingham Board of Education, 648 F.2d 950, 954-55 (5th Cir. 1981).
 
 
 34
 Moreover, even if, as the district court held, the plaintiffs' Title VII claims were properly before the court, the use of the McDonnell Douglas allocation of the burden of proof, as opposed to any other manner of proceeding under Title VII, was appropriate. Cross-appellants have attempted to convince us that their suit is a "pattern and practice claim," in which proof of a pattern of unlawful discrimination is established at the first, or liability, phase of trial and issues of individual entitlement to relief are reserved for the second stage. That label is inaccurate as applied to this case and cannot alter the fact that plaintiffs Bell, Odol, and Lindsey must prove their claim that they were discriminatorily refused positions as trainmen. This is not a "pattern and practice" suit by the government under section 707, 42 U.S.C. § 2000e-6, in which the government may postpone until the "remedial" stage of trial proof that each individual for whom it seeks relief was discriminatorily denied an employment opportunity. See International Brotherhood of Teamsters v. United States, 431 U.S. 324, 361-62, 97 S.Ct. 1843, 1867-68, 52 L.Ed.2d 396 (1977). Nor is this a private class action, in which a similar manner of proceeding with the production of evidence is appropriate. See Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).[28] An individual proceeding as an individual under Title VII must prove the elements of a discriminatory hiring claim as set forth in McDonnell Douglas. This the cross-appellants failed to do.
 
 
 35
 In sum, we reverse the district court's conclusion that the plaintiffs' Title VII claims were not time-barred and affirm its application of Georgia's twenty-year statute of limitations to the plaintiffs' section 1981 claims for equitable relief, its finding of liability under section 1981, and its dismissal of the cross-appellants. We remand to the district court for further proceedings on the issues of equitable relief available under section 1981.
 
 
 36
 REVERSED IN PART; AFFIRMED IN PART; and REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452-October 14, 1980
 
 
 [1]
 Oliver W. Scarlett, H. B. Starkes, Franklin D. R. Bell, David Jones, M. L. Morgan, W. J. Odol, L. A. Waters, W. R. Lindsey, J. Wimyond Jones, Horace T. Thomas, and William D. Rood joined as plaintiffs in the single complaint. See Fed.R.Civ.P. 20. Morgan later withdrew. Although the complaint itself did not acknowledge any differences among the plaintiffs, later factual developments revealed that the remaining ten conveniently fell into two groups: (1) the "conductor plaintiffs"-Scarlett, Starkes, Rood, Thomas, and J. Jones-whose complaint developed from the fact that they had been denied promotion to the position of conductor in the late 1930's and early 1940's and (2) the "trainmen plaintiffs"-Bell, D. Jones, Lindsey, Odol and Waters-whose complaint developed from their initial employment in positions other than trainmen
 
 
 [2]
 The Seaboard Coast Line Railroad was formed in 1967 when the Atlantic Coast Line Railroad merged with the Seaboard Airline Railroad. Each plaintiff was initially employed by the Atlantic Coast Line Railroad
 
 
 [3]
 The United Transportation Union, established in 1969, is the successor to four craft unions: the Brotherhood of Railway Trainmen, the Order of Railway Conductors, the Brotherhood of Locomotive Firemen, and the Switchmen's Union of North America
 
 
 [4]
 Specifically, plaintiffs asked for "a declaratory judgment that the policies and practices (of defendants) violated the provisions of 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1981" and "a permanent injunction enjoining defendants from maintaining or continuing the policies and practices of denying, abridging, withholding, conditioning and limiting or otherwise interfering with the rights of plaintiffs as provided by 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1981." Even more specifically, plaintiffs asked the court to grant "a permanent injunction enjoining defendants from maintaining a seniority system which discriminates against black employees by depriving them of seniority which is enjoyed by white employees," to grant "an order enjoining defendants from refusing to credit seniority gained by plaintiffs while working in formerly black jobs upon their transfer to formerly white jobs," and to award plaintiffs "back pay in the amount they would have earned ... if they had been able to exercise their accumulated seniority on the same terms and for the same purposes as white employees." Complaint P 13, Record, vol. I, at 1
 
 
 [5]
 The six were J. Jones, Starkes, Scarlett, Thomas, D. Jones, and Lindsey. The plaintiffs also called William M. Sellers, a retired Atlantic Coast Line Railroad employee, and Samuel A. Baker, Jr., an employee of SCL and a local union representative, as witnesses
 
 
 [6]
 The two treatises were The Black Worker by Sterling D. Spere and Abram L. Harris, first published in 1930, and Negro Employment in Land and Air Transport, by Herbert R. Northrup, Howard W. Risher, Jr., Richard D. Leone and Philip W. Jeffress, published in 1971
 
 
 [7]
 The district court ruled that D. Jones, Rood, Scarlett, Starkes and Thomas are entitled to retroactive seniority. It dismissed the claims of four of the trainmen plaintiffs-Bell, Lindsey, Odol and Waters-because, it concluded, they had not made out a prima facie case of pre- or post-Act racial discrimination. Finally, it ruled that J. Jones' claim for seniority relief was moot because he had retired from the railroad's employ
 
 
 [8]
 The district court directed the parties to consider two additional issues focusing on relief: (1) any additional retroactive seniority to which D. Jones is entitled and (2) the back pay to which D. Jones, J. Jones, Rood, Scarlett, Starkes and Thomas are entitled
 
 
 [9]
 Scarlett explained how a white conductor "rolled" him from a preferable switchman's job by invoking his conductor's seniority, even though Scarlett had greater seniority as a switchman. The "job seniority" system made it possible for the white conductor to roll him, Scarlett said, because it maintained "preferential promotion rights for white employees over Negro employees" and "(t)he basis for exercising these rights was length of service in a classification from which Negro employees were historically excluded." Plaintiff's Exhibit 1
 Seniority on the SCL is established by time of service in a particular craft, such as trainman or conductor, rather than by time of employment generally. Because the craft of conductor was not open to blacks until the mid-1960's, blacks were unable to begin to accumulate conductor seniority until then. Obviously, then, a white conductor who accepted the position during those years when blacks were excluded would rank senior in conductor seniority to a black who accepted the first conductor position open to him, even if the black had worked longer on the railroad. Undoubtedly, a black who had served many years as a trainman was reluctant to accept a conductor's position, since he would have to forfeit his trainman seniority and begin at the bottom of the conductor seniority pole. In a purported attempt to encourage acceptance of promotions to conductor, the union and the railroad agreed to make it possible for a conductor to elect to work as a trainman and thus not forfeit any conductor seniority. This election was called "switching by preference," and it was in this way that Scarlett was rolled from his switchman's (trainman's) position in 1972. Scarlett was unable to protect his job as switchman because the white conductor's aggregate seniority was greater, and thus he was able to "switch by preference." Scarlett, however, was unable to claim the vacant conductor's position because he had not been able to accumulate enough conductor seniority, since that position had only recently become available to him.
 
 
 [10]
 See note 1 supra (names of plaintiffs)
 
 
 [11]
 Plaintiffs challenged the court's conclusion that the seniority system was insulated from attack. See Section III infra (discussion of seniority system)
 
 
 [12]
 Apparently, plaintiffs' lawyer received a letter from the EEOC dated December 12, 1977, stating:
 This is to advise that the subject charge has been closed by reason of the fact that the U.S. District Court now has jurisdiction.
 Plaintiffs themselves (other than Scarlett and J. Jones) were sent similar letters on February 22, 1978.
 We have been provided with a copy of a Court Order issued by the United States District Court for the Southern District of Georgia Waycross Division, Civil Action No. 576-32. This document clearly established that you are one of several plaintiffs who have filed suit against the Seaboard Coast Line Railroad Company under Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1866 alleging maintenance of a discriminatory seniority system.
 We are therefore, dismissing the above referenced charge because of no jurisdiction by this Commission.
 We do not have copies of these letters; the district court clearly had read them, so we do not question their existence. See Record, vol. VI, at 182.
 The district court at first concluded that these letters clearly indicated that the administrative process was at an end and, consequently, that they triggered the time limit within which plaintiffs had to sue. See Zambuto v. American Telephone & Telegraph Co., 544 F.2d 1333 (5th Cir. 1977). The district court refused to allow those plaintiffs who received such notice to amend, because the motion to amend was filed well beyond the 90 day limit. Record, vol. VI, at 171. The district court later changed its mind. Record, vol. VI, at 182.
 
 
 [13]
 We do not have copies of these letters either. We are told, in Plaintiffs' Recast Complaint, that plaintiffs received the notices on August 10, 1978 and September 25, 1978. Record, vol. I, at 183
 
 
 [14]
 Defendants' raise other arguments, primarily factual in nature and focusing on the existence and contents of the various charges and administrative responses, that need not detain us. The district court, commendably we think, attempted to resolve these factual issues prior to trial, and there is enough in the record before us to support its conclusions. Cutliff v. Greyhound Lines, Inc., 558 F.2d 803 (5th Cir. 1977), does not compel us to conclude otherwise. In Cutliff plaintiff had offered absolutely no evidence indicating that he had filed an administrative complaint; we were unwilling to presume that a charge had been filed even though an administrative response had been received. In the instant case there is evidence indicating both that a charge had been filed and that a response had been received. See Record, vol. III, at 176, 187. Furthermore, there is evidence supporting the district court's conclusion that both defendants, SCL and UTU, were properly before that court. See Record, vol. VII, at 201:2 n.2
 
 
 [15]
 In Coke we overwhelmingly endorsed the notion that an analogous 180-day requirement in the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 626(d)(1), is not related to the subject matter jurisdiction of a federal court, although satisfying it is a pre-condition to filing suit. 640 F.2d 584, 595 (5th Cir. 1981) (en banc). That holding, drawing as it did on Title VII cases for support, strongly implied that the Title VII filing requirement at issue here must be construed in like manner. See id. at 587 (noting the common purpose of Title VII and ADEA, the similar statutory schemes, and the identical filing periods)
 
 
 [16]
 See note 9 & accompanying text supra
 
 
 [17]
 In Dumas we held that appellant's claim was properly dismissed because it affirmatively appeared from the record that she complained about a specific act of alleged discrimination
 
 
 [18]
 The defense provided by section 703(h) reads in relevant part:
 "(I)t shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority ... system, ... provided that such differences are not the result of an intention to discriminate because of race ...."
 42 U.S.C. § 2000e-2(h) (1976). This court has construed section 703(h) to provide a defense to employment discrimination claims brought under 42 U.S.C. § 1981 as well as to actions brought under Title VII. Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1191 n.37 (5th Cir. 1977), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). See note 23 infra.
 
 
 [19]
 The district judge found that this practice persisted into the late 1960's and early 1970's. There is no contention that the defendants currently employ this tactic
 
 
 [20]
 See section III infra for a more thorough discussion of these allegations
 
 
 [21]
 That section provides:
 All suits for the enforcement of rights accruing to individuals under statutes, acts of incorporation, or by operation of law, shall be brought within 20 years after the right of action shall have accrued: Provided, however, that all suits for the recovery of wages ... shall be brought within two years after the right of action shall have accrued.
 Ga.Code.Ann. § 3-704 (1975).
 
 
 [22]
 Adjustment of seniority was held appropriate as to plaintiffs Scarlett, Starkes, Thomas, Rood, and D. Jones
 
 
 [23]
 Bona fide seniority systems which are protected by section 703(h) of Title VII, 42 U.S.C. § 2000e-2(h), are not violative of section 1981. Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1191 n.37 (5th Cir. 1977), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). Obviously the converse is also true. A seniority system which is not bona fide under section 703(h) offers no defense to liability under section 1981
 
 
 [24]
 See note 2 supra
 
 
 [25]
 On October 3, 1979, the district court entered its findings of fact and conclusions of law, in which the court ruled, inter alia, that these plaintiffs failed to establish a prima facie case of racial discrimination against them. It entered an order clarifying seniority relief as to the conductor plaintiffs and D. Jones on November 16. Defendant UTU filed its notice of appeal from this order on November 28. On January 15, 1980, the court denied a motion by the dismissed plaintiffs to reconsider its dismissal. This cross-appeal followed that denial
 
 
 [26]
 The individual must show "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824
 
 
 [27]
 The court focused on the common requirement of proof of discriminatory intent. Baldwin v. Birmingham Bd. of Education, 648 F.2d 950, 954 (5th Cir. 1981) (citing Grigsby v. North Mississippi Medical Center, Inc., 586 F.2d 457, 460-61 (5th Cir. 1978) (section 1981), and International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977) (Title VII))
 
 
 [28]
 As we noted earlier, class certification was denied for lack of numerosity